SOUTHERN TRACTION CO. v. ROGAN.
(No. 1832.)

(Court of Civil Appeals of Texas. Texarkana Nov. 9, 1917. Rehearing Denied Nov. 27, 1917.)

1. APPEAL AND ERROR ⚖═500(4)—REVIEW—RECORD—MATTERS PRESENTED.

Objections to the general charge and to the action of the court in submitting special issues will not be considered on appeal unless by proper authentication the record discloses that the objections were presented in the court below within the time prescribed.

2. TRIAL ⚖═253(6)—INSTRUCTIONS—REFUSAL.

A special charge ignoring an issue of fact clearly presented by the evidence is properly refused.

3. RELEASE ⚖═18—VALIDITY—FRAUD.

On the day of her husband's burial, who was run down by defendant's car, plaintiff, a widow, who was a deaf-mute, was induced to enter into a settlement with defendant. Plaintiff did not have sufficient funds to pay for her husband's burial, and defendant's agent represented that, if the charges were not paid, the body would be exhumed and thrown into the potter's field, and defendant's agent further represented that the plaintiff had no cause of action whatsoever, and that the only sum which she might receive was mere gratuity. *Held*, in view of the situation

of the parties and the fact that plaintiff reproached herself for having directed her husband to go on the tracks of the defendant, the settlement which was inadequate in amount must be deemed the result of fraud and coercion, and cannot be sustained.

**4. TRIAL ☞143—JURY QUESTION—CONFLICTING EVIDENCE.**

Where the evidence is conflicting, the question is for the jury.

**5. TRIAL ☞253(6)—INSTRUCTIONS—REFUSAL.**

In an action for wrongful death, where defendant set up a release which plaintiff attacked on several grounds, including fraud and duress as well as mental incapacity at the time the release was entered into to understand its purport, the court submitted only the issue of mental incapacity to the jury, though the evidence raised the other issues. *Held*, that the failure of the court to submit the other issues relating to the validity of the release did not destroy plaintiff's right to have them passed upon either by the court or the jury, and did not warrant the giving of special charges which ignored such issues.

**6. TRIAL ☞139(1) — PEREMPTORY INSTRUCTION—PROPRIETY.**

Where the evidence raised issues of fact, the direction of a verdict for defendant is improper.

**7. RELEASE ☞21 — CONTRACTS — RATIFICATION.**

Where the evidence tended to show that plaintiff, when she executed a release, was the victim of fraud and duress, as well as that her mental condition at the time might have been such as to preclude her from understanding the terms of the release, there was no ratification by reason of plaintiff's subsequent acceptance of the sum mentioned in the release where at the time of ratification plaintiff had not learned of her rights; for there can be no binding ratification of a voidable contract so long as plaintiff was subject to the disabilities which made the contract voidable.

**8. RAILROADS ☞400(14)—INJURY TO PERSONS ON TRACKS — ACTIONS — EVIDENCE — DISCOVERED PERIL.**

In an action for the wrongful death of plaintiff's husband, who was run down by defendant's car, question of whether defendant's motorman was guilty of negligence after discovering the husband's peril *held*, under the evidence, for the jury.

**9. RAILROADS ☞377—INJURY TO PERSONS ON TRACKS—PRESUMPTION.**

The rule that those in charge of trains have a right to presume that persons walking on the track will observe the usual danger signals and seek a place of safety has no application when those in charge of cars know or have good ground for knowing that for some reason the warnings were not heard or will not be observed.

**10. RAILROADS ☞390—INJURY TO PERSONS ON TRACKS—DISCOVERED PERIL.**

For one walking on railroad tracks to come within the doctrine of discovered peril requiring those in charge of trains to exercise care for one in a position of peril, it is not necessary that the pedestrian should be in actual danger; it being sufficient if it is apparent that he is about to enter into a perilous situation.

**11. APPEAL AND ERROR ☞218(2)—PRESENTATION OF GROUNDS OF REVIEW IN COURT BELOW—NECESSITY.**

Where defendant's motorman testified that deceased was in his observation continuously from the time he was within 400 or 500 yards from him until he was struck, a special issue submitting the question whether the motorman on discovering deceased's peril used all means at hand consistent with the safety of his car to avoid striking deceased, calling, as it did, for a categorical answer, was not objectionable as on the weight of the evidence in assuming that deceased was in a position of peril, and defendant, not having requested the submission of the issue of deceased's position of peril, cannot raise the objection on appeal.

Appeal from District Court, McLennan County; E. J. Clark, Judge.

Action by Lula P. Rogan against the Southern Traction Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Spell & Sanford, Nat Harris, and Chas. B. Braun, all of Waco, for appellant. J. D. Williamson and Cross & Rogers, all of Waco, for appellee.

HODGES, J. On July 19, 1914, William Rogan was killed, while walking on the appellant's track between Gross and Ralph, two stations not far from Waco, by one of the appellant's motorcars. This suit was instituted by the appellee, Lula Rogan, his widow, in the early part of August thereafter, to recover the resulting damages. In substance, the plaintiff below alleged that the appellant's right of way between those two stations was commonly used by pedestrians as a pathway, with the knowledge, consent, and acquiescence of the appellant; that William Rogan was deaf, and while walking north on the right of way between two stations known as Gross and Ralph was struck and fatally injured by one of appellant's cars. It is alleged that the defendant was negligent in running the car at a reckless and dangerous rate of speed, in not warning William Rogan of the approach of the car, and in failing to stop the car after discovering Rogan in a perilous situation. The appellant alleged, among other defenses, a settlement; that after the death of William Rogan the appellee, Lula Rogan, in consideration of the sum of $519.50 paid to her as damages for the death of her husband, executed a release. By a supplemental petition the appellee admitted the execution of the release, but alleged that it was procured through trickery, fraud and duress, and that at the time she signed the instrument she was mentally incapacitated to understand and comprehend its meaning. She tendered back the sum received, and further requested that in case she recovered a judgment this sum be deducted from the amount of the damages awarded to her.

The case was submitted to the jury upon the following special issues:

(1) "Was the plaintiff at the time she signed the release in question to the defendant traction company in such a condition of mind as to render her incapable of understanding and appreciating the nature and effect of such a release, even if plaintiff knew or had been advised of the contents thereof?" To this the jury answered "Yes."

(2) "Did defendant's motorman at the time in question, on discovering the peril of plaintiff's deceased husband, use all the means at hand

---

consistent with the safety of his car and the occupants thereof to avoid striking the deceased?" This was answered in the negative.

(3) The third issue related to the amount of damages, which the jury placed at $1,519.50, from which the court deducted $519.50 received as the consideration for the release theretofore executed.

Many of the material facts adduced on the trial below were undisputed. It was shown that William Rogan and his wife lived near the right of way of the appellant; that late in the afternoon of July 19, 1914, at the request of his wife, Rogan started to the house of a neighbor for the purpose of obtaining some milk. He used the path leading over the appellant's right of way. One of the appellant's motorcars going from Waco to Waxahachie overtook and struck Rogan, inflicting injuries from which he died. Rogan was a deaf-mute, but that fact was unknown to the motorman at the time. As will be observed, the only ground of liability was that of discovered peril. Upon that issue the testimony was conflicting, and will be discussed under an appropriate assignment.

[1] In the first assignment of error the appellant insists upon the insufficiency of the evidence to authorize the submission of the first special issue. Objection is made to the consideration of that assignment, upon the ground that the record contains no properly authenticated statement that objections to the charge were made at the proper time in the court below. There is in the record an unauthenticated instrument in which are incorporated the objections here urged. It is signed by counsel for the appellant and by the judge of the trial court, but over the signature of the latter is the word "Refused." It has been repeatedly held that objections to the general charge and to the action of the court in submitting certain special issues will not be considered on appeal unless by proper authentication the record discloses that those objections were presented in the court below within the time prescribed by statute. Railway Co. v. Wadsak, 166 S. W. 42; G. & T. Ry. Co. v. Dickey (Sup.) 187 S. W. 184.

[2] Appellant presented three special charges in the court below, each of which was in substance a peremptory instruction to the jury to find for the defendant. In two of those charges the direction was based upon the proposition that the release was valid and binding and concluded the plaintiff's right to any further damages. The other special charge informed the jury, as a matter of law, that the appellee's husband was a trespasser at the time he was killed, and for that reason she was not entitled to any recovery. This last-mentioned charge ignored the issue of discovered peril which the evidence clearly raised, and for that reason alone was properly refused.

[3] A more serious question, however, is presented in the propositions embraced in the other requested instructions. The evidence shows that on the day of the burial of the appellee's husband, and within a short time thereafter, she executed a release reciting the receipt of $519.50 as a settlement for the damages resulting from the death of her husband. It was further shown that on the following day $400 of that sum was paid to and accepted by her. The remainder was, with her consent, applied to the payment of the funeral expenses of the deceased. Upon that settlement the appellant now stands, and resists further liability.

While the appellee attacked, in her petition, the validity of the release upon several distinct grounds, only one was submitted by the court as an issue of fact to be passed upon by the jury, that of the mental incapacity of the appellee at the time she made the settlement. Conceding the correctness of the appellant's contention that the evidence was insufficient to support the finding made upon that issue as submitted, there was evidence sufficient to support a finding upon one or more of the other grounds upon which the validity of the release was attacked. It is undisputed that the appellee belonged to that class of unfortunates who can neither hear nor speak. The evidence tended to show that she was an ignorant woman and unfamiliar with her legal rights. She was carried directly from the burial of her husband to the office of the appellant's claim agent, for the purpose of discussing a settlement. The negotiations between her and the claim agent were carried on through one of her husband's brothers, who acted as an interpreter. She testified that her husband's brothers, who were present, told her that Mr. Ross, the claim agent, would give her enough money to bury her husband; that that sum must be paid, or he, the claim agent, would have her husband's body taken up and buried in the potter's field. We quote the following from her testimony:

"He [the interpreter] said Mr. Ross was sorry for me and would help me, but I had to sign the paper. They asked me for my plans for the future. I did not know. I said we were planning to build a little house in Oaklawn. They asked me what it would cost to build our house. I said a small three-room house about $300 or $400. * * * Mr. Ross said he would pay for the funeral and leave me $400 to build my house and then I could go to work, and that he would help me only for pity because he was sorry for me; that my husband had no right to walk on the track; that there was a law against deaf-mutes going on the road. They told me to sign that writing; that if I did not sign it they would take his body up from the grave in Oakwood Cemetery and throw it in the potter's field. I did not read the writing that I signed. As to my mental and physical condition at that time, I was heartbroken. I was heartbroken, for I thought I had killed him when I made him go after the milk. They had me up there in that office about a half an hour or an hour. I did not know what was in the writing that I signed and did not care as long as he could stay in the grave."

If these facts are true, there is presented a situation where the contracting parties

were not dealing upon anything like equal conditions. To conclusively presume that an ignorant deaf-mute widow, too poor to bury her dead, while enduring the griefs of recent bereavement made sharper by feeling of self reproach, should be able to protect her legal rights in a contest with a trained and unemotional representative of a great corporation, is demanding too much of the human mind. If at the time this settlement was made the appellee had a well-founded claim for damages against the appellant, the amount she then received was grossly inadequate. If she was induced to make that settlement and accept that sum by the representations that her husband at the time he was killed was unlawfully trespassing upon the property of the railway company, and for that reason she was not legally entitled to any compensation for his death, that what was offered was a mere gratuity, tendered through sympathy for her poverty and distress, and that, if the release was not then executed, the grave of her husband would be reopened and his body transferred to the burial ground for paupers, then she was overreached, coerced, and imposed upon in a way which the law cannot sanction.

[4-7] It is true the testimony of the appellee was disputed by other witnesses, but that only presented a conflict, and did not remove the issue of fact from the province of the jury. As long as there were present issues of fact raised by the pleadings and the evidence which were sufficient to sustain a finding against the validity of the release, it would have been improper for the court to direct a verdict in the appellant's favor. The failure of the court to submit those other issues relating to the validity of the release did not destroy the plaintiff's right to have them passed upon either by the court or the jury. Logically the consideration of peremptory instructions comes first in determining what directions shall be given in a jury trial, and the propriety of giving them depends more upon what the court should do at that stage of the proceedings than what he may thereafter decide to do. The court's failure to submit the proper issues of fact for the avoidance of the release could not by retroaction make an erroneous special charge proper.

One of the two special charges referred to above is based upon the conduct of the appellee in accepting the $400 the day after the release was executed and retaining it. It is contended that, even if she was mentally incapacitated at the time to execute a binding release, her contract was voidable only, and open to an affirmance when that disability was removed, and that the evidence conclusively shows an affirmance at a time when she was suffering from no mental incapacity. That argument is founded upon the assumption that mental incapacity was the only issue which should have been submitted in that connection. If when that charge was requested the pleadings and the evidence were such as to show that the appellee may have been influenced to execute the release by fraud or duress, the bare fact that she on the next day accepted the money and failed to repudiate the settlement is not sufficient, as a matter of law, to defeat her right to recovery. There is no evidence that she then knew any more about her legal rights than she did the day before. If she had then been deceived as to her rights, or was acting under compulsion of some kind, the deception may have still continued. There could be no binding ratification by her of a voidable contract so long as she was subject to the disabilities or impositions which made the contract voidable.

[8-10] In the last assignment of error it is contended that the evidence was insufficient to justify a finding that the motorman discovered the deceased in time to avoid the injury. The motorman testified that there was no one on the car except himself and the conductor. They left Waco at 7 o'clock p. m., and when a short distance out he saw a person ahead walking on the end of the cross-ties on the outside of the rail. This person afterwards proved to be William Rogan, the deceased. The witness was not acquainted with Rogan at the time, and did not know that he was deaf. When he first discovered Rogan the latter was about 400 or 500 yards from the car, going in the same direction. Witness then began to blow the whistle, and continued to sound it till the car was within about 200 feet of Rogan. The failure of Rogan to make any move to get off the track caused the witness to check the speed of his car, and just as he was about to stop Rogan stopped off of the ties on to the ground and continued to walk there until the car, the speed of which in the meantime had been increased, was within about 25 feet of him. He then suddenly stepped on the track in front of the car and was struck by it. The witness further testified that after Rogan got on the track the second time he did all in his power to stop the car, but was unable to do so. A Mrs. Bateman, who appears to have been an eyewitness to the occurrence, testified that she was on the railroad crossing some distance in front of Rogan and the car; she saw both when they were a considerable distance away. She heard the motorman sound the whistle, and saw Rogan walking on the track. He was walking on the inside and near the west rail. She noticed the car slow down and then start up again; the car never came to a stop until after Rogan was struck. She testified further that she saw Rogan continuously from the time her attention was first attracted when the car was some distance from him, and that he never got off the track. In this particular she contradicted the testimony of the motorman. The latter further testified, after stating the extent to which he had sounded the whistle, that he intended to stop

the car, get down, go to Rogan, and find out whether or not he was drunk; but that when Rogan stepped off on the ground he started his car again. This clearly indicates that the motorman had discovered, before Rogan was struck, that there was something wrong with him, something to indicate that he was not giving the proper attention to the danger signal. If the jury accepted the statements of Mrs. Bateman that Rogan never left the track, but continued to walk in front of the car in a place of danger, then they had a right to conclude that his peril was discovered at a time when the injury might have been prevented.

Counsel for appellant refers to a group of cases which in effect hold that those in charge of railway trains have a right to presume that persons walking on the track will observe the usual danger- signals and seek a place of safety. But that doctrine has no application when those in charge of cars know, or have good ground for believing, that for some reason the warnings are not heard or will not be observed. H. & T. C. Ry. Co. v. O'Donnell, 99 Tex. 640, 92 S. W. 409. To constitute discovered peril it is not always necessary that the injured party should be in a place of actual danger. It is sufficient if it is apparent that he is about to enter a perilous situation. H. & T. C. Ry. Co. v. Finn, 107 S. W. 94; Id., 101 Tex. 511, 109 S. W. 918. The facts distinguish this case from the group to which the appellant refers. Here it appears from the motorman's testimony that he discovered that the danger signal was not being regarded, and, according to his own admissions, he thought something was wrong with the man. That being true, he was put upon notice that an injury would probably result unless he stopped the car. We think the evidence was sufficient to justify the court in submitting the issue and to sustain the answer given.

[11] It is also contended that this portion of the court's charge was on the weight of the evidence in assuming that the deceased was discovered in a perilous situation at a time when the injury might have been averted. The submission of this issue in the form selected called for nothing from the jury except a categorical answer, "Yes" or "No." It is not subject to the objection made. The facts are undisputed that the deceased was, just before he was struck, in a perilous situation, and that he was discovered by the motorman. According to the motorman's own testimony, the deceased was under his observation continuously from the time he was within 400 or 500 yards of him till he was struck. If the appellant desired to have the jury pass upon the question of timely discovery it should have made an appropriate request. Having failed to do so, it cannot now complain that the court reserved and exercised that privilege.

The judgment is affirmed.